IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LAURA L. ROZUMALSKI,

                    Plaintiff,

v.

W.F. BAIRD & ASSOCIATES, LTD.,

                    Defendant.

OPINION and ORDER

17-cv-523-jdp

---

Plaintiff Laura Rozumalski was an engineer with W.F. Baird & Associates, Ltd. from 2010 until she was fired in 2014. She alleges that her termination was the result of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act. Baird moves for summary judgment. Dkt. 15.

In 2012, Rozumalski complained of serious sexual harassment at the hands of her supervisor. Baird promptly investigated and terminated the supervisor. Baird then promoted Rozumalski, first to the supervisor's position, and then to head a division of the company. The arc of Rozumalski's career at Baird shows that she was successful and well regarded until she responded negatively to suggestions for improvement provided in a performance review. Ultimately she was terminated for admitted non-compliance with a performance improvement plan. No reasonable jury could conclude that Rozumalski's termination was the result of retaliation or sex discrimination. The court concludes that the material facts are undisputed, and that Baird is entitled to judgment as a matter of law.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.[1]

Rozumalski began working for Baird in 2010 as a water resources engineer in the company office in Madison, Wisconsin. She was responsible for conducting watershed studies, water resources analyses, hydraulic modeling, and other assignments related to water engineering. Rozumalski performed her duties in this position at a level that met or exceeded Baird's expectations.

In July 2012, Rozumalski was sexually harassed at an out-of-state work conference by her then-supervisor, Mark Riedel. She reported the incident to Baird management, and Baird promptly conducted a two-day investigation, after which Baird terminated Riedel. After Riedel's termination, Baird promoted Rozumalski to Riedel's former position. At the end of the year, Baird gave Rozumalski a positive performance evaluation and a $12,688.00 bonus—substantially more than the target bonus initially set for her by the company.

In the spring of 2013, Rozumalski was again promoted, this time to leader of Baird's rivers and watershed core service area. In this position she had significantly more responsibility

---

[1] Rozumalski's summary judgment submissions suffer from two deficiencies. First, Rozumalski's brief does did not fully comply with the court's procedures, because it mostly cites directly to evidence, such as an affidavit, rather than to a proposed finding of fact. As a result, the court cannot tell whether the factual assertion in the brief is disputed or not. Second, Rozumalski cites evidence that does not support the factual proposition. To cite one example, Rozumalski says that "Riedel admitted that it was possible that he discussed Laura with Brunton during their December 10, 2013 breakfast meeting." Dkt. 34, ¶ 71. She cites the Riedel deposition, Dkt. 25, at 125:3–126:4. But Riedel's testimony was that he did not remember the breakfast meeting *at all*, so Rozumalski's paraphrase is a stretch. The court has tried to decide this case on the merits, based on the evidence, but Rozumalski's approach to presenting the evidence has greatly complicated the court's task.

and oversaw increasingly complex projects. In June 2013, Baird presented her with another bonus, for $6,958.00.

After Riedel's termination, Rozumalski reported to Alex Brunton, a senior geoscientist who worked out of Baird's office in Oakville, Ontario. Aspects of Rozumalski's work were also supervised by others at Baird, particularly Lars Barber, the manager of the Madison office. In December 2013, Brunton advised Rozumalski that he would be traveling to Madison to conduct her annual review. In online chats during the week before the review, Brunton praised plaintiff's work and told her that there was no need to worry because the review would be "all good things." Dkt. 35, ¶¶ 43–45.

Brunton travelled to Madison to conduct Rozumalski's review. On December 10, 2013, the day of Rozumalski's review, Brunton met Riedel for breakfast. Brunton and Riedel had maintained a friendly relationship, and in his post-Baird jobs, Riedel was in a position to direct work to Baird. (Riedel testified that he does not remember the meeting at all; Brunton testified that they did not discuss Rozumalski.)

Rozumalski's in-person review was not uniformly positive. Rozumalski' review was based on feedback from Brunton, Barber, and Robert Nairn, an engineer from the Oakville office with whom Rozumalski had also worked. Although Baird did not express any grave concerns relating to her performance, Rozumalski was informed that she needed to improve in several areas. Brunton followed up with a letter on December 19, which detailed four areas for improvement:

> Maintenance of a consistently high level of quality in assigned tasks. Project and proposal work must be completed to best of abilities at all time, for both internal and external clients.
>
> Effective communication. Your communication skills need major improvement, and we are committed to helping you improve in

3

> this area. You must ensure that senior staff are advised of your progress on project and proposal tasks. You must work on being responsive to all requests so that less follow-up is required by others.
>
> Commitment to deliverables. On recent proposal efforts, several team members worked additional hours on evenings and weekends. We need you to demonstrate the same commitment to the successful completion of business development activities. All deliverables, requests, and inquiries need to be responded to in a timely manner.
>
> Timekeeping. Office hours in the Madison office are 8am – 5pm. We suggest that you be present in the office during these times, unless you have prior approval from your Resource Manager.

Dkt. 20-2, at 1. Brunton closed with a generally positive assessment: "We appreciate your efforts during 2013, and we see you as a capable future contributor to growth at Baird. We trust that you will work with us to improve upon those issues, and we look forward to supporting your continued career development at Baird." *Id*. Baird regarded the performance evaluation as generally positive, and on December 20, gave Rozumalski a bonus of $4,907. But Rozumalski thought the review was unduly harsh and off-base, and she refused to sign the performance review summary.

Baird believed that Rozumalski's work suffered from continuing deficiencies in the first quarter of 2014. On February 18, 2014, Brunton and Barber sent Rozumalski a letter reiterating Baird's concerns about her performance, and citing specific examples of deficient performance. Dkt 20-3.

Rozumalski challenged the allegations that her performance was deficient. She told Barber that the February 18 letter was inaccurate, and she expressed her concern that Brunton's treatment of her constituted retaliation. Barber asked Rozumalski to put her concerns in writing. On March 20, Rozumalski sent Barber a letter criticizing Brunton, defending her

performance, and attributing Brunton's criticism to his friendship with Riedel and to his meeting with Riedel a few hours before her performance review. Dkt. 19-2, at 2. Barber asked Rozumalski to revise the letter for distribution to others.

Jeff Bellile took over from Barber as manager of Baird's Madison office in April 2014. Rozumalski told Bellile about her difficulties with Brunton and that she though the difficulties stemmed from potential retaliation. Rozumalski sent a revised version of her letter to Barber, Brunton, and Bellile on April 14. Dkt. 21-1. In the revised version of the letter, Rozumalski did not suggest any retaliation, and she removed the discussion of Brunton's friendship with Riedel and the breakfast meeting.

On May 1, Baird responded to Rozumalski's April 14 letter with a memorandum from Belille, Barber, Brunton and Matt Clark (the resource manager in the Madison office). Dkt. 18-3. The memorandum said that Rozumalski's letter contained several factual inaccuracies and addressed them point-by-point. The memorandum concluded by telling Rozumalski that she would be placed on a formal Employee Improvement Plan, the successful completion of which would be required for her continued employment. The memorandum did not mention Brunton's relationship with Riedel and any allegation of retaliation.

On May 5, Rozumalski sent a letter in response. Dkt. 18-4. She refused to concede any factual inaccuracies in her earlier letters, and she attributed her treatment to retaliation for her 2012 report of the sexual harassment by Riedel:

> I believe that Baird has not seriously addressed my view that I have been retaliated against because I reported the sexual assault that was perpetrated against me by former Baird employee Mark Riedel. As I told both Lars Barber after my December 2013 performance review and mentioned again in my initial response letter . . . , I had been working just fine with Alex Brunton, and he reviewed my work positively, until my December 2013 review. . . . Then, he met with Mark Riedel right before my review and

5

> since that time everything has been different. . . . . I think that the proposed EIP is more of a punishment for speaking up about these issues rather than a productive plan to actually improve either this situation or my skill set.

Dkt. 18-4, at 1. Rozumalski acknowledges that this letter was the first time that she expressly alleged retaliation for reporting sexual harassment in writing. Dkt. 34, ¶ 89. Bellile responded in writing the next day, denying Rozumalski's allegations of retaliation, and confirming that she would be placed on the EIP. Dkt. 18-5.

Under the terms of the EIP, Rozumalski was subject to numerous requirements, including that she be in the office between 8:00 and 5:00 every workday and that she not work from home on evenings and weekends unless she cleared it with Bellile in advance. Dkt. 18-6. On June 23, while Rozumalski was still on the EIP, she left the office before 2:00 p.m. for a nail appointment and did not return until 3:30. She did not include that appointment on her calendar or otherwise inform Bellile or other Baird employees of her whereabouts. During her absence, Brunton received a client request pertaining to one of Rozumalski's projects. Bellile attempted to contact Rozumalski, but found that she was not in the office. Bellile spoke with Rozumalski about the incident; he terminated Rozumalski effective June 25.

Additional facts will be introduced where relevant to the analysis.

## ANALYSIS

### A. Summary judgment standard

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

Here, Rozumalski asserts claims under Title VII of the Civil Right Act of 1964. Title VII prohibits workplace discrimination on the basis of sex, as well as retaliation against any employee who asserts her Title VII rights. 42 U.S.C. §§ 2000e, *et seq*. In evaluating Title VII claims at summary judgment, courts have historically toggled between the so-called "direct" and "indirect" methods of proof, depending on the nature of the evidence presented. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763 (7th Cir. 2016). But in *Ortiz*, the court of appeals explained that the different methods have "complicated and sidetracked employment-discrimination litigation for many years." *Id.* at 764. The court of appeals instructed district courts to consider the evidence "as a whole," focusing on the appropriate legal standard on summary judgment, which "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. So to defeat summary judgment, Rozumalski must adduce evidence that would, considered as a whole, allow a reasonable jury to find that defendant took adverse action against her because of her sex or in retaliation for asserting her rights under Title VII.

**B. Retaliation**

To prove her retaliation claim, Rozumalski must adduce evidence that: (1) she engaged in a statutorily protected activity; (2) Baird took materially adverse action against her; and (3) there is a causal connection between the activity and the adverse action. *Baines v. Walgreen Co.*,

7

863 F.3d 656, 661 (7th Cir. 2017). The causation standard is more stringent for a retaliation claim than for a discrimination claim. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To succeed on a Title VII retaliation claim, a plaintiff must show that the defendant would not have taken the adverse action but for the protected activity. *Id*. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. (Rozumalski misstates the retaliation standard in her brief. Dkt. 27, at 23.)

Baird challenges Rozumalski's showing on all three elements, although the main issue is whether there is a causal connection between her protected activity and the adverse actions.

### 1. Statutorily protected activity

This first element is complicated because Rozumalski has not been clear about the activity on which she bases her retaliation claim. No one could dispute that Rozumalski's 2012 sexual harassment complaint against Riedel was an activity protected under Title VII. But in her summary judgment response, Rozumalski expressly disclaims that she is basing her current case on her 2012 report:

> [Rozumalski's] claim for retaliation does not stem from her reporting the July 2012 assault. Rather, [Rozumalski] claims that Defendant unlawfully retaliated and discriminated against her for reporting her belief that Brunton was retaliating against her due to his friendship with Riedel, her assailant.

Dkt. 27, at 28 n.7. This is a wise concession, because Baird swiftly investigated her 2012 report of harassment, took decisive action against the harasser, then promoted Rozumalski twice, and subsequently gave her a raise and bonuses. No one could conclude that there was any causal connection between Rozumalski's 2012 report and her later EIP and termination.

8

Rozumalski does not invoke the so-called cat's paw theory, according to which an otherwise unbiased supervisor can be induced to take an adverse action on the basis of misinformation provided by an unlawfully motivated co-worker. *See, e.g., Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378–81 (7th Cir. 2011). Using that theory, Rozumalski might have argued that Riedel had it out for her because of her 2012 report, and that he got Brunton to give Rozumalski a bad review. But Rozumalski makes clear that she claiming retaliation based on her complaints made to Baird *after* she got negative comments in her December 2013 performance review.

This still leaves some confusion about what protected activity Rozumalski is relying on. In response to Baird's proposed facts, Rozumalski concedes that her May 5, 2014 letter was the first time that she alleged retaliation for a report of sexual harassment in writing. Dkt. 34, ¶ 89 (plaintiff's response). In her March 20, 2014 letter, she alleged that the negative aspects of her December 2013 performance review stemmed from Brunton's friendship with Riedel and the breakfast meeting before her review. But the March 20 letter did not allege that the performance review had anything to do with a report of sexual harassment. Rozumalski contends that before her May 5 letter, she told Barber that she had been the victim of retaliation. *Id.* She cites her own declaration, Dkt. 30, ¶ 74, for support.[2] But her declaration is vague:

> As a result of my continuing problems with Alex, and receiving the February 18, 2014 letter, I again talked with the office principal, Lars Barber, and voiced my concern that I might be the recipient of retaliation.

---

[2] Rozumalski also cites her own deposition, Dkt. 21, at 128:18–21, and Bellile's deposition, Dkt. 23, at 48:16–6 [sic], to support her assertion that she discussed retaliation with Barber, but those parts of those depositions provide no support at all for that proposition.

9

The declaration refers to "retaliation" but it does not say that she told Barber that she faced retaliation for making a report of sexual harassment. Rozumalski has adduced no evidence that she made any oral report of retaliation for a report of sexual harassment beyond what she put in her letters of March 20 and May 5, 2014. So the only protected activity on which Rozumalski can base her retaliation claim are the statements in these two letters.

The court is skeptical that the March 20 letter constitutes a statutorily protected activity because that letter makes no allegation that Rozumalski had been retaliated against for any report of sexual harassment. To be sure, Rozumalski alleges that Brunton was biased against her, but generalized bias is not prohibited by Title VII. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."). But at this point, the court will give Rozumalski the benefit of the doubt, because she may have had a good faith belief that she was opposing conduct prohibited by Title VII, which is all that is required. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). The court will deem the March 20 and May 5, 2014 letters to constitute statutorily protected activities.

2. **Adverse employment action**

In general, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Of course, not everything that makes an employee unhappy is an adverse action. *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009). So actions that do not affect an employee's "responsibility, hours, pay, or any other relevant accoutrement of her position" are not adverse actions. *Id*.

There is no question that Rozumalski suffered at least one adverse employment action: termination. Likewise, there is no question that the December 2013 performance evaluation cannot be a material adverse employment action, because it occurred before the March 20 and May 5 letters that are the protected activities on which Rozumalski bases her retaliation claim. But Rozumalski alleges two more adverse actions: Brunton's systematic negative treatment after the performance review, and the EIP. Dkt. 27, at 35.

The court begins with the EIP. "Performance improvement plans, particularly minimally onerous ones . . . are not, without more, adverse employment actions." *Davis v. Time Warner Cable of Se. Wis.*, 651 F.3d 664, 677 (7th Cir. 2011). The EIP document, Dkt. 18-6, provides for close monitoring of Rozumalski's work. But it does not suggest that Rozumalski's duties, hours, pay, or any other responsibility or benefit would be changed. Rozumalski's briefing of the issue is underdeveloped in a scant paragraph. Dkt. 27, at 35–36. But the court will credit Rozumalski's declaration testimony, in which she says that her responsibilities were significantly diminished by the EIP. Dkt. 30, ¶¶ 91–92. Baird did not address the issue in its reply, and it has not rebutted Rozumalski declaration testimony. Accordingly, the court concludes that the EIP was an adverse employment action.

Brunton's alleged systematic negative treatment, however, is another matter. Rozumalski proposed only three facts on the subject, Dkt. 35, ¶¶ 57–59, all based on one paragraph of her declaration, Dkt. 30, ¶ 53. She contends that Brunton became dismissive and scolding, and that he cut back on his communication with Rozumalski. Again her briefing of the issue is a scant paragraph. Dkt. 27, at 35. Baird has rebutted this evidence in part by showing that in early 2014 Brunton had scheduled a meeting with Rozumalski that Rozumalski missed. Dkt. 20-3. And Rozumalski's March 20 letter indicated that Brunton's busy and often-

11

changing schedule was part of the explanation for why Brunton was difficult to work with. In sum, the court concludes that allegations of Brunton's change in demeanor are not borne out by the record, and that in any case, such a change in demeanor is one of the "petty slights or minor annoyances that often take place at work," and not an adverse employment action. *See Cole*, 562 F.3d at 816.

### 3. Causation

The dispositive issue here is causation. Rozumalski must adduce evidence from which a reasonable jury could conclude that Baird would not have put Rozumalski on the EIP or terminated her, but for her 2014 complaints about retaliation. *Nassar*, 570 U.S. at 360. It's worth breaking down the causation question in light of the protected activities on which Rozumalski relies.

Rozumalski's first protected activity was her March 20, 2014 letter. By that time, she had already received the performance review giving her four areas for improvement, and the February 18 letter citing specific shortcomings in Rozumalski's work since the performance review. (And even if the court were to credit Rozumalski's declaration testimony, Dkt. 30, ¶ 74, she does not claim to have complained orally to Barber before the February 18 letter.) The March 20 letter is the only protected activity undertaken by Rozumalski before she was placed on the EIP. So one part of the causation question is: has Rozumalski adduced evidence from which a reasonable jury could conclude that Baird would not have put her on the EIP, but for her March 20 letter?

Rozumalski's second protected activity was her May 5, 2014 letter in which she first explicitly laid out her allegation the she was facing retaliation for her 2012 report of sexual harassment. By that time, she had received the May 1 memorandum with the point-by-point

12

response to her April 14 letter in which she had defended her performance. The May 1 letter informed Rozumalski that she would be placed on an EIP, and then she was terminated after failing to comply with it. The second part of the causation question is: has Rozumalski adduced evidence from which a reasonable jury could conclude that Baird would not have terminated her, but for her letters of March 20 and May 5?

Rozumalski contends that the required causal connection is established primarily by the timing of her complaints, and the true quality of her work.

The court starts with the timing. There is no dispute that the adverse actions come reasonably soon after the two letters. But its well-established that temporal proximity alone is rarely enough to create a triable issue. *Stone v. City of Indianapolis Pub. Utils Div.*, 281 F.3d 640, 644 (7th Cir. 2002). This is not a case in which the adverse actions follow so immediately that timing alone supports a reasonable inference of causation. In this case, there were intervening events that undermine any inference based on timing. After the March 20 letter, Rozumalski restated her concerns without the allegations of retaliation in her April 14 letter. Baird investigated and responded point-by-point before putting her on the EIP. And after the May 5 letter, Rozumalski had six weeks of performance under the EIP, and the nails incident, before she was terminated. The court concludes that the timing of the adverse actions gives no support to an inference of retaliation.

The court turns to Rozumalski's work performance. Rozumalski contends that her work performance did not warrant the criticism that she received at the December 2013 performance review and after. But the issue is not whether Baird made accurate or fair assessments of Rozumalski's work. As has often been said, federal courts "do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Ajayi v.*

13

*Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). The issue is whether Baird's criticisms were merely a pretext for retaliatory decision-making. No reasonable jury could conclude that on the basis of the evidence that Rozumalski has put forth, for several reasons.

By the time of Rozumalski's first protected activity, the March 20 letter, Baird had already informed her in December 2013 that she needed to improve in four areas. And Baird reiterated those concerns in the February 18 letter. The fact that this criticism *precedes* her first protected activity undermines any inference that Baird's expressed criticism was a pretext to cover retaliation for her protected activities. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (previous performance warnings undermine the inference of retaliation). Rozumalski does not dispute that "Baird believes that Plaintiff's work continued to suffer from various deficiencies through the first quarter of 2014." Dkt. 34, ¶ 59. The concession is fatal: the question is not whether Baird's criticism was accurate or fair, but whether it was sincere, and Rozumalski admits that it was.[3] The sincerity of Baird's concern is reinforced by the May 1 letter, which carefully addresses the concerns raised in her April 14 letter. Rozumalski disputes Baird's evaluation of her work, but no reasonable jury could conclude that Baird did not have sincere concerns with her performance when it put her on the EIP.

---

[3] This is why Rozumalski's numerous attempts to dispute the accuracy of Baird's criticisms of her performance are immaterial. For instance, in response to Baird's allegation that plaintiff had failed to do the necessary preparations for an on-site client project in April 2014, Dkt. 34, ¶ 76, Rozumalski submits a supplemental declaration from her partner, who attests that he personally assisted plaintiff in conducting the necessary preparations the weekend before the project, Dkt. 32. But whether Rozumalski actually made the preparations is beside the point. What matters is whether Baird had a good-faith basis to believe that she had failed to do them. Plaintiff adduces no evidence to show that Baird's understanding of the incident was fabricated or insincere.

And Rozumalski does not dispute that, while on the EIP, she left the office in mid-afternoon for a nail appointment, did not return for 90 minutes, and did not tell anyone that she was going. Dkt. 34, ¶¶ 97, 99–100. Nor can she dispute that one of the issues addressed by the EIP was her timekeeping and attendance. Dkt. 18-6. Given Baird's persistent concerns with Rozumalski's presence in the office, no reasonable jury could conclude that the termination decision was pretextual.

In her brief, Rozumalski also suggests that she has direct evidence of retaliation. She contends that "Brunton himself testified that Laura was placed on the EIP precisely due to her written complaints of retaliation." Dkt. 27, at 36. For support, Rozumalski cites Brunton's deposition, Dkt. 22, at 105:3–6 and 109:1–5. Rozumalski's brief is inaccurate: Brunton testified that she was placed on the EIP for performance issues, her failure to address those issues, and because she had a poor attitude as demonstrated by the tone of her letters. *See also* Dkt. 22, at 112:7–10. Brunton did *not* testify that she was placed on the EIP because she had complained of retaliation. Rozumalski's March 20 letter alleges that Brunton was biased. But that letter, and the April 14 letter, also demonstrate that Rozumalski was stubbornly resistant to the feedback provided at her performance review and after. Rozumalski's protected activity does not insulate her from the consequences of her refusal to take constructive criticism. *Cf. Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995), *as modified* (Sept. 7, 1995) (insubordination while engaging in a protected activity is lawful grounds for termination).

At this point, it is worth stepping back to the broader context of Rozumalski's career at Baird, because Rozumalski spends so much time discussing her history with Brunton and Brunton's breakfast meeting with Riedel. Rozumalski ascribes to the breakfast meeting Brunton's suddenly negative review of her work. But this does not save her retaliation case.

First, the breakfast meeting and the December 2013 performance review are immaterial, given that the protected activities on which she bases her case occurred months later. The material issue is whether Baird's actions *after* the March 20 letter and the May 5 letter were retaliatory. At most, the breakfast meeting might provide Brunton with a motive to take an adverse action against Rozumalski. But that theory is not supported by evidence.

Rozumalski has no evidence that anything negative (or anything at all, for that matter) was said about her at the breakfast meeting. Riedel testified that he can't remember the meeting at all, and Brunton testified that they did not discuss Rozumalski. Rozumalski concedes that Brunton did not know the reasons for Riedel's termination, and did not know about Rozumalski's 2012 sexual harassment complaint, until Rozumalski wrote her May 5 letter. Dkt. 34, ¶ 73. So, regardless of what was actually discussed, we know that Riedel did not tell Brunton about Rozumalski's 2012 sexual harassment allegation at the breakfast meeting.

Rozumalski argues that Brunton and Riedel must have discussed her, because it is implausible that Brunton would not explain why he had come to Madison. But Rozumalski has not adduced evidence that her performance review was the *only* reason for Brunton's trip to Madison. And even if Brunton had told Riedel that he had come to Madison to do Rozumalski's performance review, that does not mean that Riedel must have said something negative about her.

Rozumalski suggests that a reasonable jury could infer that they discussed her at the breakfast meeting, because immediately after the breakfast meeting, Brunton abruptly turned on her, switching from uniform praise to harsh criticism. But the abrupt switch perceived by Rozumalski is not supported by the record. Rozumalski did get generally positive feedback before her December 2013 review, but she had received criticism from Brunton. Consider, for

16

example, Brunton's emails offering feedback on Rozumalski's writing. He was generally encouraging in his comments, but the comments demonstrate that Brunton expended significant effort editing Rozumalski's work. ("Thank you for a very good review. Well done. Don't be put off by the red ink (I edit heavily)." Dkt. 30-3, at 1.) More important, the December 2013 review was her first after being promoted to leader of Baird's rivers and watershed core service area. As Rozumalski acknowledged in her March 20 letter, she had undertaken significant new responsibility and had a lot to learn. The performance review included criticism and constructive feedback, but Baird did not regard it as a negative review, and Rozumalski got a bonus and a raise afterward. Dkt. 34, ¶ 56. So the evidence does not support Rozumalski's contention that Brunton abruptly turned on her after, and because of, the breakfast meeting.

Yet another problem with Rozumalski's theory is that Brunton was not solely responsible for the adverse actions. The December 2013 review was based not just on Brunton's opinion, but also on input from Barber and Nairn. The February 18 letter of instruction was from Brunton and Barber. The decision to put Rozumalski on the EIP was made by four: Belille, Barber, Brunton, and Clark. And the EIP itself was signed by Belille, and supervised by Belille and Clark. Belille made the termination decision. Rozumalski has adduced no evidence that the breakfast meeting would have affected anyone at Baird but Brunton. The idea that the breakfast meeting had turned the whole company against her is simply speculation.

In sum, Rozumalski has not adduced evidence from which a reasonable jury could conclude that Baird would not have put her on the EIP or terminated her but for her allegations of retaliation in her letters of March 20 and May 5. Baird has adduced ample evidence that it

had good-faith reasons to take these steps, and Rozumalski has failed to provide evidence that these reasons were merely pretextual.

## C. Sex discrimination claim

Rozumalski also contends that Baird's actions constitute discrimination on the basis of sex in violation of Title VII. Her one-page briefing of this claim is underdeveloped. Dkt. 27, at 37. She makes one main point: that she was treated less favorably than Riedel or Brunton.

Rozumalski cites no direct evidence of discrimination, such as sexist comments. By invoking two male colleagues as comparators, Rozumalski is apparently invoking the burden-shifting framework for circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff in a Title VII case can establish a *prima facie* Title VII case by showing that that: (1) she is a member of a protected class; (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer. *Id.* at 802. If the plaintiff satisfies this *prima facie* burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual. *David v. Bd. Of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

But Rozumalski has not made a prima facie case because she fails to show that either Riedel or Brunton are similarly situated to her.

Rozumalski contends that Riedel was not put on an EIP for inappropriate sexual conduct toward her and other employees. She says that Baird was aware of this conduct, but

she cites no evidence, and she does not explain what this conduct was. Riedel was terminated almost immediately on the basis of Rozumalski's complaint of sexual misconduct, so ultimately he was not treated more favorably than Rozumalski.

Rozumalski also contends, based exclusively on Riedel's deposition testimony, that Brunton had the same type of performance issues that were charged against Rozumalski, but that Brunton was never put on an EIP or terminated. Rozumalski does not spell out what these performance issues were, and she does not show that they were brought to the attention of Baird management. Rozumalski has not shown that Brunton was "treated more favorably than she was by the same decisionmaker." *See Mourning v. Ternes Packaging, Indiana, Inc.*, 868 F.3d 568, 571 (7th Cir. 2017); *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008).

Rozumalski also contends that both Riedel and Brunton received raises when they got promoted, but that Rozumalski did not. This bare assertion of discrimination in compensation is so perfunctory and undeveloped that the court will deem it waived. *See United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017).

Rozumalski says that failure to meet a particular *McDonnell Douglas* factor is not necessarily fatal to a plaintiff's discrimination claim, so long as the evidence proffered could reasonably support a jury verdict of discrimination. Dkt. 27, at 24 (citing *David*, 846 F.3d at 224). But without direct evidence of gender bias, relevant comparator evidence, or any other evidence that Rozumalski's gender factored into Baird's decision-making, no reasonable jury could infer that Baird discriminated against plaintiff on the basis of sex. The court will grant summary judgment on Rozumalski's sex discrimination claim.

ORDER

IT IS ORDERED that defendant W.F. Baird's motion for summary judgment, Dkt. 15, is GRANTED.

Entered November 9, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge